Mr. Wahhaj raised three issues in his opening brief and joined three in co-defendant Mr. Morton's brief. I would like to get to at least the first issue raised in Mr. Wahhaj's brief, severance. Before that, I just want to try to quickly respond to some points that the government made in the other three issues that Mr. Wahhaj joined. First, as to the self-representation issue, the real-time transcripts, there's been some speculation about what that exactly is. There's nothing in the record about what that is. The only mention in the record of what the real-time transcript is, is Mr. Wahhaj complaining that it's not working. So I don't think that we can assume that it did work and this was effective as part of the modified procedure in any way. As to the jury note, that fourth jury note, which the government says it has addressed, the government hasn't addressed it in any meaningful way, trying to explain how it's not particularly meaningful, especially important, and that the defendants should have been able to weigh in on it. It asked whether the jury can find them guilty if they find they committed an overt act, basically without considering the other elements of the offense. The implication there was, is it enough that we just find them guilty of an overt act? Clearly, the answer to that is no. The jury was very confused about what the elements of the offense were. That is at least as important as, if not obviously more so, than the evidentiary issue at issue in France. And then there was a question about whether the defendants have to claim they would have said, would have done something, said or done something different. The government, I think, said something along the lines of not necessarily, but McDermott is absolutely clear that they do not have to allege that they would have said something different, that that has nothing to do with it. If there are no further questions about that, I can move on quickly to the motion to suppress. Do you have any comments on the bench conferences? Just that we don't know what real time is? I mean, I'm certainly happy to answer any questions. I mean, I would say to Judge McHugh, your question about McDermott, didn't it say this is a fact specific inquiry and that minor incursions don't suffice? This court in McDermott, when it was referring to minor incursions, it was specifically referring to Mills, where the defendant was initially excluded from a few bench conferences, which he did not object to. Then he objected and was excluded from a few more. That's the kind of minor incursion that the court was talking about. And in McDermott, they're saying, well, yeah, some minor incursions like in Mills where they're only excluded from six might not count. But here in McDermott, he was excluded from more than 30 in an eight day trial. So here where the pro se defendants were excluded from 48 over the course of a three week trial, that's definitely not a minor incursion that the McDermott court was referring to by referencing Mills. As for the motion to suppress, the government wants this court to ignore New Mexico law and just generally think whether it was reasonable. But New Mexico law is what, as the Thomas court put it, the state law codified their reasonable expectation of privacy by saying that they don't have to vacate the premises, that they're allowed possession of the premises until they're lawfully evicted. So here looking to New Mexico state law is incredibly important. So whether the UORRA applies or not, either way, a tenant cannot be removed, is allowed to retain possession of property until they're evicted by court order. And that's the unlawful detainer argument? Right. It doesn't the case law say that although that is true, I mean primarily so that we don't have violent removals, it doesn't in any way speak to the legal rights of who has the right to be there. So the quotes that the government uses about the unlawful detainer statute doesn't determine who actually gets to be there, that's confusion about whether the difference between the statute confusingly addresses forcible entry and unlawful detainer, which is one cause of action in one subsection, and then the remaining four subsections are about holdover tenants and evicting holdover tenants. And this unlawful detainer, this is the original eviction statute for New Mexico. The UORRA was adopted later and that carved out certain residential leases, but the unlawful detainer statute still applies to holdover tenants generally where the UORRA doesn't apply. And those other four subsections are specifically the original eviction statute for holdover tenants. And so your position is that they were holdover tenants? Yes. And what's the tenancy based on? The tenancy is based on just general black letter law of property, common law property, that where you have permission to have exclusive possession to reside on the property, that creates a tenancy. Whether the owner of the property understands that they're granting a tenancy or whether they consider themselves a landlord or whether they were requiring rent, that's beside the point. Under the law, if you give somebody the exclusive right to live at a property, an exclusive possession, that's a tenancy. And then that tenancy continued even after the contract of sale fell through based on the New Mexico court's decision in Moore, which makes it clear that the traditional relationship of landlord and tenant exists where the purchaser or would-be purchaser enters the land prior to the consummation of the sale and then defaults. Then at that point, it reverts to a tenancy and they owe back rent. Very quickly on the prosecutorial misconduct before I'd like to get to severance. It's not just Judge McHugh that you pointed out that they used up, the comment that they used up all the reasonable doubt they're due. It's the context before that. He specifically says they've already been given their reasonable doubts in their previous encounters with law enforcement. So it's not that, oh, well, they're no longer entitled to reasonable doubt because we already proved their guilt beyond a reasonable doubt with our overwhelming evidence. It's they already got their reasonable doubts in these prior contacts with law enforcement and they got away. And so they've used up all the reasonable doubt that they're due. And the government says that it's, you know, the it's the lacking the egregious, the egregiousness of Petro. And I disagree with that. I think claiming that defendants used up all their all the reasonable doubt they're due in previous in previous encounters with law enforcement is a pretty egregious, pretty egregious thing to say because it's just blatantly false. Their prior long contacts with law enforcement has nothing to do with whether they're entitled to reasonable doubt. Does it matter that both the defense attorney and the prosecutor actually stated the correct reasonable doubt standard in the argument? No, not here. When the so the only thing that the correct statement of law that the prosecutor gave was just at the very beginning when they said, if we prove beyond their guilt beyond a reasonable doubt, you have to find him guilty. That's all they said. So by later saying they've already used up all their reasonable doubt anyway, that's not cured by there. I mean, by later completely confusing what reasonable doubt even is, comparing it to the benefit of the doubt you get in contacts with law enforcement and then saying you're not even entitled to it. The fact that they initially said that if we prove it beyond a reasonable doubt, then you have to find guilty, did nothing to cure that error. If we agree with you that they were improper statements, were they plainly improper? I mean, do we have any law on reasonable doubt, rather than presumption of innocence, that would have made it plain such that the court should have sua sponte stepped in here? Not specifically on reasonable doubt in the same way, but it is so closely linked with the presumption of innocence. And the prosecutor was using reasonable doubt in a way that made it pretty interchangeable with presumption of innocence. He's saying they've already used their benefit of the doubt. They've already used their reasonable doubts. So he's equating benefit of the doubt, reasonable doubt, and saying they're no longer entitled to this benefit of the reasonable doubt. That's pretty indistinguishable from saying they're no longer entitled to presumption of innocence. We have some cases that actually say when you've got a whole bunch of defense counsel in the courtroom, and this is said, and nobody pops out of their chair to say, hey, wait a minute. That's some indication that it wasn't plain. How many defense counsel were in the courtroom during? I'm not sure how many they were, but I know nobody objected in Petro, and nobody objected in not Mahorny, but the one after Mahorny. So your position would be, you know, the whole reason we're here in plain air is that people missed it. Exactly. Now, if I could get to the severance issue. Severance was required because Mr. Wahaj was not charged with any crime relating to the kidnapping and death of A.G., yet highly inflammatory evidence of the kidnapping and death, which would be excluded in a separate trial under Rule 403, would cause him severe prejudice that limiting instructions couldn't cure. Indeed, the government's pretrial proffer on which the motion was based alleged that Siraj killed A.G. On appeal, the government argues that this evidence would not have been excluded under 403, but the government didn't raise this argument below. The district court, as a result, the district court didn't address it, and this court is prohibited from conducting its own de novo 403 balancing test in the first instance. The only issue on appeal with respect to severance is whether the district court correctly determined that any prejudice caused by this evidence could be cured with limiting instructions. It did not, and this court was therefore reversed. In Toney, this court made clear that this court does not do Rule 403 balancing in the first instance. It's for the district court to do on remand. Thus, the government's main argument is something that this court simply cannot do. It does not make an argument that, it does not actually defend its argument below, or the district court's reasoning adopting that argument, that even if all that prejudicial evidence would be excluded under Rule 403, that nevertheless he wouldn't suffer prejudice. Here, again, the evidence that the government said it was going to present at trial was that Mr. Wahage intentionally deprived A.G. of his necessary life-saving medication, took him away from the mother, who is the primary caregiver, and the one responsible for giving him his medication, performed exorcisms on a daily basis, and that one of these exorcisms resulted in the child's death. With all of that evidence, no reasonable juror could dispassionately weigh the evidence to determine whether Mr. Wahage was guilty of a completely different crime, knowing that they could not hold him responsible for any kidnapping-related death charges. And I see that I only have two minutes, if I may. Wouldn't some of the background have to come in to understand the charges about your intent to kill a federal officer? I mean, you sort of need the background of what they believed, and this army that they were going to be part of, and what that army was going to do. I mean, wouldn't a lot of that come in? Well, all of the, anything related to the, so the second conspiracy was based on a prophecy that Janney had after A.G. died, and that was that he was going to, it was all, it was based upon this idea that he was going to resurrect, and that's when the conspiracy to kill federal officers supposedly emerged. So nothing that happened before that, other than the fact that A.G. was dead, and therefore, I mean, which goes hand-in-hand with the fact that he's resurrecting, or the belief that he's resurrecting. None of the previous evidence, at least not, even if certain bare facts about how they got to New Mexico, things along those lines, the most prejudicial evidence about how, and again, in the government's proper evidence, they specifically said that it was the exorcisms that killed A.G. That, those details of the exorcisms and of the children's testimony about seeing white foam and slime coming out of his mouth, none of that is relevant to, or is necessary to prove the later conspiracy. If I may reserve my time for rebuttal. Yes, Your Honors. Thank you, Your Honors. Tiffany Walters, again, for the United States. I'd like to start by addressing some of the various arguments that Suraj has made regarding some of the topics we've already discussed, unless the Court would prefer me to start with severance. So first, as to the bench conference issue, the defense points out that the overt acts instruction was so central to being an issue of importance. I'd like to point the Court to what the overt acts instruction actually said, which clearly states the law, and it was fair for the district court to just say, go back and read what we've already told you. So I'd point to page 3598 of the sixth volume of the record. It states, just black letter, overt acts law. The United States does not have to prove all of these different acts for you to return a guilty verdict on this count, but in order for you to return a guilty verdict as to count three for each charged defendant, all 12 of you must agree upon which of the acts, if any, the charged defendants committed, and that the charged defendants committed at least one of the acts listed. So I think the instruction was quite clear on overt acts. Well, I guess the issue isn't whether the district court would have done the same thing if defendant had been consulted. The issue is whether defendant had a right, when appearing pro se, to interject into that decision, whether or not he was able to ultimately change the decision, right? Certainly, and I think that would veer into the erosion argument. I think there's a strong position that defendants acquiesced, at least in the bench conferences, because they had the opportunity to come back up and ask to speak, and they didn't do it. So then we're not up at the level of 58 or 48 or however many conferences. We're talking about this one jury note conference. But if it was substantial, I mean, if it was substantially interfered with their ability, why do we even get to the erosion concept? I mean, I get that when you're talking about, oh, a whole lot of conferences where not a lot was being said, but we're talking about a jury note, a question that was significant, and they're not being able to participate in a response. That's substantial. Well, I think it's one instance. And I don't know how that fits into this idea of eroding. Well, I think it is, but also in Mills there were bench conferences that defendants were prohibited from participating in. There's no indication that those weren't substantial, and yet a few bench conferences were not sufficient. I think this falls into a similar thing. In the context of the whole trial, this is one jury note conference, and ultimately it was just an instruction to tell the jury to read. I don't see even comparing a bench conference, most bench conferences, to a jury question about what's sufficient to find someone guilty, the ultimate question. Right. In the context of this bench conference, or this jury note conference, they're just telling them to go back and read the instructions. That's what they told them, but perhaps that was not what they would have suggested. Well, they haven't identified anything they would have suggested otherwise, even on appeal.  And that's correct. But still, I think that one instance in the context of the whole trial is more nature of an erosion like Mills than a complete categorical exclusion, which is what McDermott was, was that you cannot speak on legal issues. That was the court's reasoning in McDermott, and the court found that that violated fair rhetoric. So I think this is more in the nature of Mills than McDermott. The practicality issue with respect to bench conferences is significant. We've talked about that. But the jury instructions, not so much. I mean, you've got a limited number. The jury's not involved. They're sequestered. I mean, it seems to me there it's a lot easier to bring the defendant in and let him participate. Should that affect our analysis between bench conferences and jury notes? I think still it centers on whether or not it's an issue of importance and whether or not it was not just eroded but violated. And I think here it falls more under the eroded at most side of the equation. Let's see. It's moving on. It's severance, I think. Okay. I'm sorry? I thought you were wondering where to go. I'm trying to go to the next. I just briefly am a prosecutor of misconduct. Before I switch over to severance, I neglected to mention the strength of the evidence, which is another prong three issue that is significantly different in this case than Stark's, Mahorny, and Petro, all of which involve sort of a he said, she said witness credibility situation. Here we have certainly some legal disputes, but I don't think there's a big dispute as to what the evidence showed that the defendants did. So I think that distinguishes this case as well. And to the extent that defendants are now arguing for the first time that these comments go to presumption of innocence, they did not make that argument in their briefs. And to the extent it can be read that way, it clearly isn't plainly the presumption of innocence because they haven't identified that before today. Also, as a prosecutor of misconduct, the mention of the various discussions with prior contacts with law enforcement all went to the benefit of the doubt, I think is the phrase that the prosecutor used. And those were also responsive to defense arguments that they had made that if the police couldn't stop them, then how could defendants have known or have stopped the contact or that all this could have been prevented by the law enforcement intervening earlier. So I think they have to be understood in that context. Also, I point the court to the Adams case, which involved a reasonable doubt statement. In that case, the prosecutor said that defendants cannot get beyond a reasonable doubt, but then also made statements correctly stating the reasonable doubt standard. And in that case, the court did not find plain prosecutorial misconduct, where just a few sentences earlier, the prosecutor correctly stated the law. So I think that also supports the idea that this brief, potentially confusing statement wasn't sufficient to be plain prosecutorial misconduct, or that it does not rise to the level of a violation under prong three, because under the circumstances, there's no reasonable probability that had those few words not been said, that anything would have been different. I think that is all my prosecutorial misconduct. Oh, and then there were six defense counsel there, two for Hoosier, two for Zupana, and two standby counsel. And finally, as to the standing issue, it's clear that any tenancy that did exist was terminated, and I just want to briefly address the Moore case. That case involved a situation in which the person who had forfeited on a, was at fault in the failure of a purchase contract, but had used the property in the meantime, they had to pay rent for the time that they got, you know, unfairly got to use the property. And it doesn't apply the other way around. If the seller was the one at fault in the contract, there's no payment. So I think that's more an issue of damages. Moore never says that you get a right to sit on that land going forward, even after that tenancy is terminated. What about the argument that they were holdover tenants under New Mexico law, and that they had the right to be there until they were formally evicted? Even if they were holdover tenants, it's clear that the tenancy had been terminated, and the only thing happening at the level of eviction is getting them off the land. I mean, that would be adopting a rule that no matter how clearly the tenant is in violation of the lease and should be evicted, that they retain a reasonable expectation of privacy until the moment the sheriff comes to drag them off of the property. And I don't think that that is correct under this court's law. If you look to Ruckman, this could have happened at any time, and there's no defense that Lucas could have raised in any eviction proceedings. It's not like there's any disputed claim that we have to address. So I think that I point the court also to the Hunyadi case. I think that's how you say it out of the Sixth Circuit, and Zimmerman, both of which were cases in which the court found no reasonable expectation of privacy, but yet there was no formal eviction order, so this court would be in keeping with those decisions. So I would, unless there's any other questions on that, I'd like to turn to severance. And I think it might be helpful to start, I'm sorry, let me get to these notes, with a little bit of background on what happened in the district court. So a defendant can only demonstrate prejudice if he could show that something would have been different in an individual trial. It's not enough to say, you know, that there was bad evidence that came in. There has to be a difference between the joint trial and the individual trial. And here Suraj hasn't done this. His argument is that there wouldn't have been any need for any evidence up until after A.G. had died and we have the subsequent prophecy about resurrecting from the dead and leading an army, because this prior stuff isn't really relevant to the charges against him. I think that's the argument. And I would push back against that, because this wasn't just a conspiracy to kill federal officers in the context of the prophecy, it was also a conspiracy to kill federal officers that might come to get Abdul Ghani off the land. And so for that reason, it's important to know that they, the jury would have to know, that they took Abdul Ghani from his mother with the intent to conceal him from his mother and that they believe the FBI was after them because they had Abdul Ghani. And it's also important for them to know that Suraj killed Abdul Ghani, because that goes to the question of whether or not he thought the FBI was coming after him and whether or not he believed that he was being targeted for investigation by federal officers. So all of this is so intertwined. And the district court actually ruled on this, right? So first, this was not the first severance motion that the defendant had filed. There had been a prior severance motion. And the district court ruled on that and said that Suraj's involvement, this is a quote, involvement in the conspiracy was inextricably intertwined with the involvement of the other co-conspirators, and it found that severing Suraj from the trials of his co-defendants would result in two virtually identical trials in terms of witnesses and evidence and would amount to a waste of judicial resources and could even lead to possibility of conflicting and irreconcilable verdicts. And that's at the first volume of the record, page 227. So when Suraj makes a second motion for severance, this is not the district court's first time addressing this issue. And as to Rule 403, he just says this evidence is categorically irrelevant and has zero probative value and that any probative value is outweighed by prejudice. And that's the extent of the argument. That's the whole substance of it. In response to that, the government says, quote, the district court's earlier ruling on the inextricable evidence and that there would be two identical trials and argues that this is relevant evidence that would be necessary factual underpinnings to the conspiracy charges. There's no concession. The government's arguments go directly to Suraj's claims, even though they are not prefaced with Rule 403. They go to the substance of it. Why would a district court do a 403 balancing? So it didn't because what it said is that the evidence is inextricably intertwined and it's relevant. And to the extent there's any evidence that's cross-admissible, it would be cured through limiting instructions. And then it goes on specifically to say it's not yet ruling on the admissibility of evidence and that it would consider 403. And that makes sense because here, Suraj has objected categorically to all kidnapping evidence. And the court's saying, no, that's absolutely not true. Some of this is relevant. Some of it's going to come in. But he's made no argument as to any specific evidence. And he never does at trial. He never raises that 403 argument. So it's hard to say whether some little bits of evidence could have been shaved off the top. We don't know because Suraj never gave the district court the opportunity to rule on that. And he never renewed his motion at trial, which also deprived the district court of the opportunity to consider it in the context of the trial evidence. At the pretrial motion stage, it's very difficult for the district court to know exactly what evidence is going to come in. So any ruling as to specific evidence would have been premature at that point. And the district court did not abuse its discretion by saying, this is an issue I'm going to take up later. And then Suraj never took it up. The evidence about the FBI concern from the defendants came through the children and otherwise. How solid is it that those FBI concerns were before the death of the child as well as after? I think, let's see. I'm going to go to the actual evidence on that. I'm not sure exactly. Let's see. So I don't know that it's clear whether or not that they were speaking to the period in December before Abdul Ghani died or after that. But they did testify that they believed that the feds sent a drone to watch them, that Lucas, Subhana, and their children stayed hiding in the hole to avoid the surveillance. That would have been after Abdul Ghani's death. Janie texted her brother, quote, we're hiding because they called the FBI. And also that Suraj's own brother sent the FBI after him. And Subhana wrote in her journal, why hasn't the FBI arrested me yet? The focus of defendants were very much on the conspiracy, was on the FBI as opposed to any other law enforcement agency. And the conspiracy to kill them all. Is that what you just cited, is that before or after A.G. died? So I think most of this probably was after A.G. died. But for purpose, I'm sorry. What about the training with the firearms? You know, we've got the pictures of the kids with the firearms and stuff. I mean, was that before or after the prophecy that A.G. was going to rise from the dead? I think the bulk of that, the firearms training videos were after his death. His death was right around Christmas. So not terribly long after they arrived. But I'd have to confirm that. Does that matter? I don't think it does. Because the conspiracy to kill federal officers doesn't turn on the deaths of Abdul Ghani. The fact that they believed that the FBI was after them and that they agreed to kill any FBI officers that came to him, to the compounds, whether before or after, that's sufficient to meet the elements. And Abdul Ghani's, the timing of Abdul Ghani's death does not play into that. Well, I guess it matters if they believed the FBI was after them before or after the child's death because it affects whether you need the evidence up until the child's death, right? Right. I guess on that point, I would say that they were missing flyers that were screenshotted by Siraj on his phone. So they were clearly aware that law enforcement was after them. I'm not sure if that was specific to the FBI. But they were aware that they were coming after them. And their understanding was that it was the FBI that was after them. So I think between those two pieces of evidence, the jury could infer that even beforehand, they believed that the FBI was after them. But I don't know that it makes a difference for the conspiracy charges because that's not an element of them. Further questions? All right. Thank you, Counsel. Thank you. And if you would increase the time to three minutes or 321 or whatever our technology will handle. Okay. Thank you. Thank you very much, Your Honor. First, I just want to point out on the self-representation issue that this court considered cumulative error, their exclusion from bench conferences and the jury note conference together, whether that was a violation as opposed to a mere erosion. And you're saying there should be two separate errors? Is that what you're saying? No, I'm saying, yeah, there are two separate errors. But you can consider the effect on their substantial, whether it was a violation, you consider that cumulatively. Okay. And then as to the practicality of having these modified procedures and what to do, the most practical situation is to simply let the pro se defendants who are representing themselves at trial participate in the bench conferences. The government says turning to the prosecutorial misconduct, the government relies on the fact that in recounting the three prior encounters, the prosecutor specifically said benefit of the doubt each time. But it prefaced discussion of those encounters by saying something to the effect of speaking of reasonable doubt, they've been given the benefit of the doubt in these prior encounters. So they start off by conflating these issues, implying that the benefit of the doubt given in these prior encounters has something to do with the reasonable doubt standard. And then immediately after using benefit of the doubt three times, it says they've had their reasonable doubts, they've had their benefit of the doubt. So it's clearly conflating those two concepts. Quickly on the suppression issue, the government hasn't cited a single case where a tenant was found to have no, or somebody who was once a tenant was found to have no reasonable expectation of privacy. All of its cases are squatters, people who never had any permission to be there whatsoever, or who had something less than a tenancy, like at a hotel room where all you have is a license, not a tenancy. And then as for severance, you only get to a Rule 403 analysis if the evidence is relevant. So we're not, I'm not on appeal disputing that some evidence of the previous conspiracy of kidnapping and resulting in death would be relevant to the later conspiracy. And that's all the District Court ever said, only ever said that it was relevant. The District Court never found, and its finding of relevance was mostly in determining whether they were properly joined. My point is that the, Mr. Wahaj argued that it would be excluded as under Rule 403. The government never disputed that below. And that's why the District Court didn't rule on it. Well, the District Court said, I'm not ruling right now whether this evidence will come in because I need more information that will develop as this is tried for me to be able to make that determination. And there was never a renewed objection to the evidence asking the judge to do that. Is that a problem for you? No, Your Honor, I see that I'm out of time, but if I can quickly respond. That's not the reason the District Court didn't. The District Court didn't say, well, I don't have enough information to rule on this now. It just said that I'm, I haven't ruled on this yet, on evidentiary issues yet. But it doesn't matter because this, this, even assuming that this evidence wouldn't come in, in a separate trial, this isn't, this doesn't amount to a showing of actual prejudice that severance requires. So that's why it didn't address Rule 403. Thank you, Your Honor. Thank you, counsel, for your arguments and briefing in this case. The case is submitted. Counsel are excused.